## United States Rock Asphalt Corporation et al. v. Covington Trust & Banking Company et al.

(Decided January 22, 1929.)

ROBERT C. SIMMONS and FAUREST & FAUREST for appellants.

MYERS & HOWARD for appellees.

OPINION OF THE COURT BY JUDGE LOGAN—Reversing.

On February 6, 1925, the Black Rock Asphalt Company, as party of the first part, entered into a contract with George H. Leathers, party of the second part, which contract related to the sale of 8,000 acres of asphalt lands located in Grayson county, Ky. The contract provided that Leathers should pay to the company $150,000 in money as part payment for the leases on the land, of which sum $2,500 was to be paid in 30 days, $5,000 in not less than 60 days, $7,500 in not less than 90 days, and at least $15,000 each 30 days thereafter until $150,000 should be paid to the company. There was a provision in the contract that, if Leathers should fail to make payment of any one of the installments when due, his rights under the contract should terminate, and the installments already paid should be forfeited to the company as liquidated damages. The foregoing provisions of the contract related to the money which was

to be paid to the Black Rock Asphalt Company in part payment for the leases.

Then followed a provision to the effect that, in addition to the first $150,000, Leathers was to pay an additional $150,000 in like installments, which was to be used by the company to exercise the options which it had on asphalt and coal deposits; and to take title to the property in the name of the company for the use and benefit of Leathers, which property was to be conveyed to Leathers, or to any person or corporation to whom he might direct in writing when $300,000 should be paid. Leathers was given the election to request the company, when he paid any installment, to convey to him, or as he might direct, land in proportion as the amount so paid bore to the total amount to be paid. It was agreed that not less than 3,000 acres of land' should be acquired. Then followed another provision, to the effect that if Leathers should fail to make payment· of any one of the installments when due, which money was to be used for the purpose of exercising options on the coal and asphalt deposits, his right under the contract should be ended, and the installments already paid to the first ·party should be forfeited as liquidated damages, and, in addition, that the title to the land itself, which had been conveyed to Leathers under the provisions of the contract, should inure to the use and benefit of the company.

The contract closes with provisions relating to the payment of royalty to the company which are not material to the issues in this suit.

The contract relates to separate and distinct payments. $150,000 is to be paid for the lease on the land, and the forfeiture provision relating to these payments is that a failure to meet the installments as due should allow the company to retain what had been paid as liquidated damages. The other installments relate to money which should be paid to the company with which it was to exercise the options which it held on the land. -The forfeiture provision, as to the installments which were to be used to exercise options, was to the effect that any money paid should be treated as liquidated damages, and should be retained by the company, and further that any land which had been conveyed to Leathers should not be held by him, but the title should inure to the benefit of the company.

On March 25, 1925, by supplemental contract between the parties the original contract was modified. The modification provides that Leathers shall pay $300,000 in money in part payment for the leases, and the amounts of the installments and the dates of payment are changed. There was a further modification to the effect that the company should convey by deed to Leathers, or as Leathers might direct, the asphalt and coal deposits on which the company held option in proportion as the amount so paid should bear to the total amount agreed upon to be paid, until the company should convey to Leathers 3,000 acres at the price of $100 per acre. The company bound itself to execute deeds covering such land as might be paid for free from incumbrances, except as to royalties. Another modification is to the effect that the company should pay the rentals on the leases as provided by the terms of the options which it held, and that the amount so paid should be submitted to Leathers, and that he should repay the company the amount of the rentals. There is a provision in the supplemental contract that the money so paid by Leathers for the account of the company was to be placed in escrow, and that Leathers should have 60 days from the date of payment to enable him to examine the titles to the property proposed to be conveyed, and the money should remain in escrow during said period.

The forfeiture provision in the original contract does not appear to have been abrogated by the supplemental contract, unless the change in the contract should be construed to mean that Leathers was to pay no money to be used by the company for the purpose of exercising the options which the company held on the land. The supplemental contract does provide, however, that the money shall be placed in escrow and there held until the company should execute a satisfactory deed for as much land as the money would pay for under the terms of the agreement.

The escrow agreement was executed on the same day as the supplemental contract. It was agreed that the Covington Savings Bank & Trust Company, which has since changed its name, should be made the depository for such funds as should be paid on account of the purchases mentioned in the contract, and that the funds so paid to the escrow agent should be held by it pending an examination of the title by Leathers. The agreement

is expressed in the escrow contract that the company, upon the payment by Leathers to the bank, should designate what lease, or leases, and the acreage which should be conveyed to Leathers, and should convey it to him, and upon his acceptance of the title the money should be paid by the bank to the company. It is further provided in the escrow agreement that the bank shall retain the funds, and the deed after it is made, for a period not longer than 60 days within which time Leathers shall approve or disapprove the title to the property intended to be conveyed. If he did not approve the title, he agreed to inform the company of the defects in the title, and that the bank should then hold the money until the question of the title should be determined.

On the 14th day of May, 1925, Leathers assigned the contract in full force and effect with all of his rights thereunder to the appellant, the United States Rock Asphalt Corporation.

Later, the date is not given, there was a further modification of the original and supplemental contracts, agreed upon by the Black Rock Asphalt Company and the United States Rock Asphalt Corporation. This supplemental contract comes close to being a substitute for the original contract and the supplemental contract which had been entered into. By the terms of this last agreement, the United States Rock Asphalt Corporation was to pay $5,000 to the Black Rock Asphalt Company on or before October 21, 1925; by September 16, 1925, it was to pay to the selling company an additional sum of $10,000; by January 1, 1926, it was to have paid a total of $100,000, including $15,000 which had been previously paid. It was agreed that in the event $60,000 should be paid by January 1, 1926, the Black Rock Asphalt Company would give 60 days' additional time to pay the remaining $40,000, if a note should be executed for that sum with satisfactory security. For the $100,000 so paid the Black Rock Asphalt Company agreed to convey to the United States Rock Asphalt Corporation 1,000 acres of the land described in the original contract. The last agreement contains this provision: ''The cash or purchase money payments herein provided for are to be in lieu and in the place and stead of the cash or purchase money payments heretofore provided to be made by second party to first party but same do not affect or

modify the payment of royalty, minimum production, payment of rentals, etc.''

Then follows a provision that the second party will begin the construction of a plant to be located on the property on or before October 15, 1925. There is a further provision that 90 per cent. of any sums realized by the second party from the sale of asphalt in place, in working out its financial arrangements, shall be paid to the first party until the $100,000 shall be paid. Then follows a provision which has the effect of changing, at least to some extent, the forfeiture clause in the original contract. The provision is that, in the event any of the payments are not met as provided in the last arrangement, the asphalt and coal that had been conveyed to the United States Rock Asphalt Corporation by the Black Rock Asphalt Company shall remain in the possession of the first-named company, with the privilege in the second-named company for a period of two years to repurchase the acreage so conveyed at the price of $100 per acre.

The last clause in this last agreement is to the effect that the second party agrees to notify the first party by November 30, 1925, whether or not it will purchase the additional 2,000 acres provided for in the original agreement, and in the event it should desire to purchase the additional acreage it should then make a fixed payment when the contract should be renewed.

The escrow agreement was not modified by this last agreement between the parties. It may be that the forfeiture clause in the original agreement was not abrogated, although the effect of the subsequent agreements was to render that provision of the original contract that any installment which had been paid to the Black Rock Asphalt Company should be treated as liquidated damages nugatory. Under the modified agreement, there was no provision for the payment of any money except through the escrow agent, and the escrow agent was not authorized to turn the money over to the Black Rock Asphalt Company until it had conveyed sufficient acreage to entitle it to the money so placed in escrow.

The $5,000 which was to be paid by the terms of the last agreement not later than August 21, 1925, appears to have been transmitted to the escrow agent on or about August 25, 1925. There is a letter in the record of date August 26, 1925, written by the president of the escrow agent, advising the United States Rock Asphalt Cor-

poration that the check for $5,000 had been received, and that it had been sent through for collection. It was also stated in the letter that the money was to be held under contract entered into between Leathers and the Black Rock Asphalt Company, which contract had been assigned by Leathers to the asphalt corporation.

On September 26, 1925, the United States Rock Asphalt Corporation appears to have written the Black Rock Asphalt Company that it was unable to comply with the terms of the agreement, and that it could not meet the payment of $10,000 due September 16th. In response to that letter, the Black Rock Asphalt Company answered, and in the course of the letter said: "By reason of your failure to comply with your contract and the several modifications and changes in same the contract has been automatically canceled. We thank you for your courtesy in the matter and regret your inability as evidenced by your letter to comply with your contract."

On October 2, 1925, the United States Rock Asphalt Corporation addressed a letter to the escrow agent, wherein it was stated that the corporation had been notified by the Black Rock Asphalt Company that the contract existing between them had been canceled. The letter referred to the $5,000 held by the bank in escrow for asphalt property for which no deed had been made or tendered, and requested a return of the funds.

The Black Rock Asphalt Company, which had received a copy of the letter sent to the bank, replied to it, and suggested that a careful reading of the contract would show that the $5,000 should be treated as liquidated damages. The letter also contained the information that the deed which was to be made for this $5,000 had been prepared, and was ready for delivery when the company learned that the corporation was unable to carry out the terms of the contract. The letter concluded with the statement that the contract was canceled, and a consideration of its renewal would not be considered without a substantial payment.

Nothing further appears until December 23, 1925, when the United States Rock Asphalt Corporation by letter again requested the return of the $5,000 by the bank. It was not returned, and this suit was instituted to recover that sum of the bank.

The petition and the amended petition substantially set out the facts we have stated. The court sustained

a demurrer to the petition, and the case is before us on an appeal from that judgment. It is argued for the Black Rock Asphalt Company that the money was paid to it as the bank was its agent, and for that reason under the terms of the original agreement the $5,000 should be treated as liquidated damages and should be turned over to it. We cannot agree with this contention. The money was paid to the escrow agent upon the agreement that it should be held in escrow until the Black Rock Asphalt Company executed a deed of conveyance for 50 acres of land. There is no claim that the deed was ever tendered. If a satisfactory deed should have been tendered within 60 days, the money should have been paid over to the selling company and the deed accepted. If a deed should have been tendered and the title was unsatisfactory, the money should have been held until the question of title had been settled; but, as no deed was tendered within the 60 days allowed, and the original contract was entirely canceled without the tender of a deed, it seems clear to us that the United States Rock Asphalt Corporation was entitled to a return of the money. The bank was not the agent alone of the selling company, but was also the agent of the purchasing corporation. In "Restatement Contracts," section 103, the American Law Institute thus states the rule governing in such cases:

"(1) A promise under seal is delivered in escrow by the promisor when he puts it out of his possession without reserving a power of revocation, and with the expressed intent that the promise shall become a contract under seal upon the happening in the future of some condition not expressed in the document, and shall not become a contract under seal until that time. This condition must be something other than the promisor's future mental desire or intention.

(2) On the happening of such a condition as is stated in subsection (1) the promise becomes a contract under seal. Until the time has elapsed for the happening of the condition that was fixed by the promisor when he delivered the document, or, if he then fixed no time, until a reasonable time has elapsed for the happening of the condition, the promisor has no power to annul the delivery. Thereafter he has a right to reclaim the document, if the condition has not happened."

458

Under this rule the United States Rock Asphalt Corporation had the right to reclaim the funds which had been deposited in escrow upon the failure of the Black Rock Asphalt Company to tender a deed within 60 days in accordance with the terms of the contract.

We will not pass upon the question as to whether the attachment lien claimed by the First National Bank of Cherry Tree, Pa., is valid, as that is a question which addressed itself to the chancellor. It brought suit in the Grayson circuit court and obtained an attachment which was levied on the escrow agent, and as this money belonged to the United States Rock Asphalt Corporation, if the proceedings were regular and there were no prior liens, it could obtain a lien in that way and have the funds subjected to its debt. Other questions which may have been raised on the record are not disposed of. The demurrer to petition as amended should have been overruled, as it stated a good cause of action.

Judgment reversed, and cause remanded for proceedings consistent with this opinion.